ALAN S. FUTERFAS
ATTORNEY AT LAW
565 FIFTH AVENUE, 7TH FLOOR
NEW YORK, NEW YORK 10017
(212) 684-8400

ELLEN B. RESNICK

BETTINA SCHEIN
OF COUNSEL

FACSIMILE: (212) 684-5259
asfuterfas@futerfaslaw.com

August 10, 2011

By ECF
Hon. Jack B. Weinstein
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Kenneth Marsh, 10 CR 480 (JBW)

Dear Judge Weinstein:

We write in response to the government's sentencing letter to the Court dated August 2, 2011 (DE 360).

**Cherry Picking Gone Amok**

The Court should strike the "Victim Testimony" as inconsistent with its prior rulings and woefully deficient on their face to establish causality between any losses and the fraudulent activity charged. The evidence the government proffers represents the "slippery slope" that Mr. Marsh's plea was intended to avoid. (April 6, 2011 T. 23) While the government presents these hand-picked "victims" as proof of the "devastation of the fraud," its evidence primarily reinforces the concerns expressed by this Court with the relevance and fairness of such proof – concerns that prompted the Court to state repeatedly and emphatically that it would not allow such evidence at sentencing. See, e.g. "Please, you are dealing with a court, not a jury. Cherry picking and that kind of stuff is not going to cut any ice, when I'm dealing with sentencing an individual." (April 6, 2011 T. 27). The Court responded "I'm not going to permit it" e.g., hand-picked victims, when counsel indicated that Mr. Marsh's forthcoming guilty plea was dependent on the Court's promise to avoid a "slippery slope," e.g., "two or three people [who] lost money [suggesting that] 5,000 other people were victims." (April 14, 2011 T. 9)

ALAN S. FUTERFAS

Hon. Jack B. Weinstein
August 10, 2011
Page 2

The Court's and counsel's concern about cherry-picking was two-fold. First, for purposes of sentencing, it is neither reasonable nor accurate to extrapolate from the few to the many. Whether any particular customer lost money attributable to the fraud depends upon that customer's own trading history and interactions with Gryphon. So even if a hand-picked few were defrauded, one cannot infer that all subscribers to Gryphon were defrauded. But, secondly, even as to the hand-picked few, the government still had a duty to proffer that their losses were attributable to the fraud. And this it has not done. It is not enough to say that subscribers paid money and, in the end, suffered losses. The government must show as to <u>each purchase</u> that it was based on defendants' fraudulent inducement and that <u>each loss</u> was directly caused by defendants' fraud, and not from some other cause – like the risks inherent in the marketplace and specifically in high risk options trading. That is what the law requires. Here, the victims' testimony is proffered to prove, as the government has claimed, that "people were lied to in order to get them to pay for services," and they received "terrible information" as a result. (March 18, 2011 T. 8) Such an argument, this Court has already ruled, meant "relevancy grounds comes into play which is why I want to get this case narrowed down so we don't have to get into this unnecessarily." (Id.) The Court stated further:

> once you start putting in losses, they're going to come back with gains inevitably, and then, that brings into play this huge mass of trades. If I have a case where loss or gain is irrelevant, then we immediately cut the legs off of a lot of this discovery.

(T. 9 lines 14-18) As Magistrate Judge Orenstein stated, it is not just a question of losses and gains that comes into play once fraud beyond the initial trial subscription is alleged -- the whole dynamic of the subscribers' trading history and his interactions with Gryphon become material to determining whether any losses are attributable to the fraud. "[O]nce you go beyond that [initial purchase] to inquire into materiality of further purchases, there is at least an argument that you have to look at the whole history of purchases if only to see [what trade] each victim was aware of . . . (March 18, 2011 T. 33) This Court agreed that loss required proof of causation as to each individual victim. "If they bought multiple services, they may have bought them because they made a lot of money . . .It is going to require the kind of detailed inquiry with respect to what was lost and gained . . .$99 is one thing. Beyond that, we get into why they did it." (April 6, 2011 T. 33)

The government's proffered evidence is woefully deficient because it does not establish what trade recommendations victims actually received for each subscription they purchased and how their undocumented losses were purportedly caused by defendants' fraud. We are simply asked to accept at face value that (i) each victim received poor trading recommendations – despite the comprehensive DeNigris Report and the transparent proof of trade recommendations viewable on Streamsend -- and (ii) they suffered devastating losses as a direct result – during the

ALAN S. FUTERFAS

Hon. Jack B. Weinstein
August 10, 2011
Page 3

financially tumultuous period of 2007-2009. Rule 32 of the Federal Rules of Criminal Procedure forbids such gamesmanship. (*See* our letter Dated August 4, 2011; DE 356)

The government is proffering this "testimony" on the issue of loss but has not provided the defense with these witnesses' communications with Gryphon which are "in their possession" and that "relates to the subject matter of the witness's testimony." Fed.R.Crim.P. 26.2(a), cited in Fed.R.Crim.P. 32(i)(2). Nor has the government made these witnesses available to us to examine at sentencing or corroborated their claims of significant losses. The credibility of these witnesses is particularly suspect where they are claimants for restitution in this action with every incentive to blame Mr. Marsh for all of their actual or exaggerated losses.

An analysis of one proffered victim, William McKee, illuminates the deficiencies in the government's proof. The government claims that Mr. McKee was persuaded to purchase multiple subscriptions over time as a result of successive misrepresentations and pressured phone calls. (*See* DE 356 at 27-28) The limited documentary record available to us shows a very different story. The email correspondence with Gryphon proves that Mr. McKee was a satisfied customer from 2007 who, on his own initiative, bought and renewed multiple subscriptions with Gryphon. (*See* Exhibit A, annexed hereto.) In September 2007, he paid $5,000 for a subscription to Private Plays, $999 for Daily Option Trader and $999 for Genome. In September 2008, he renewed his one year subscriptions to both Genome and to Daily Options Trader. He received trade recommendations through Streamsend as part of his subscription service, *see* Daily Options Trader, July 29, 2009 at 10:33 a.m. (*See* Exhibit A) In June 2009, he received an email reminder that these subscriptions were about to expire. Mr. McKee responded to this email: "Thank you for the heads up. My records show that I faxed in the agreement for both [subscriptions] I will be sending in a new agreement as the date becomes closer to the expiration date." (Id.) It does not appear that he renewed those subscriptions.

In February 2008, Mr. McKee purchased Wolves of Wall Street for $50,000. (See Exhibit A) Mr. McKee's narrative does not even identify the subscriptions that he purchased through Gryphon. We doubt that the government has ever even inquired. What is clear is that the subscriptions that Mr. McKee purchased provided trading recommendations. In particular, as a subscriber to Daily Options Trader since 2007, and Wolves of Wall Street in 2008, Mr. McKee received trading recommendations that were consistently good and that generally outperformed the market, as we have shown in our wholly uncontroverted analysis of Gryphon's trading records for 2009 and 2010. (*See* the DeNigris Report)

In 2008, having renewed multiple subscriptions on his own initiative, and before becoming a restitution claimant in this action, Mr. McKee candidly told Baldwin Anderson that he blamed the stock market and his wife's own anxiety for his difficulties.

> My wife has been absolutely frantic over current status of the stock market and the only trade that Michael made was for a loss of approximately $4K so she

## ALAN S. FUTERFAS

Hon. Jack B. Weinstein
August 10, 2011
Page 4

> wanted him to stop trading in the account. I know we discussed this and I completely understand there are losses yet she was '*hoping*' to make money on the very first trade. With the current state of the stock market, she is not willing to have any trading in her account. I know we discussed this in our last call, and I realize Michael does not understand this decision; I would rather have Michael mad at me than my wife.

Id. (Italics in original)

As is apparent from these emails, not only did Mr. McKee recognize that losses might occur in a volatile market, but he indicated a desire to avoid further trading activity. He may well have missed profitable trade recommendations as a result. Our limited evidence shows that Mr. McKee was a satisfied customer of Gryphon who willingly renewed and expanded the services he requested. We can thus prove that Mr. McKee's statement is inaccurate and incomplete in material respects. We do not have the information nor the opportunity to address every claim that he makes in his statement, but that is precisely why this Court indicated that such an inquiry would not be necessary or countenanced at sentencing.

As with William McKee, the testimony of the other proffered "victims" leaves incomplete and unanswered the critical facts pertinent to determining whether the monetary losses they claim (and a host of other non-monetary misfortunes from insomnia to divorce) are caused by and attributable to the fraudulent misrepresentations charged here. For the reasons stated herein and in our sentencing memorandum, we urge that no such determination can be made. As this Court has stated, such a determination is necessarily complex, and the defense has never received the Rule 16 or 26.2 discovery to adequately address it.

### The Loss Valuation – The Uncontroverted DeNigris Report

The government persists in claiming a loss equal to the full value of every deposit into the Wachovia bank account beginning two years before the charged scheme but for approximately $830,000 that the government excludes from the result. (DE 360 at 37) The government asserts that the figure is appropriate "because the entire operation of Gryphon was a fraud." (Id.) It rejects any argument that the trading recommendations had value sufficient to offset the purchase of subscriptions. (DE at 41) It does so, not by conducting an empirical counter-analysis, but by simply dismissing the analysis of our expert, Jerry DeNigris, as a "fraud on its face." (Id.) Given its own lack of work and analysis in this case, the government really has no other choice. Even now, on the eve of sentencing, the government has no response to the now incontrovertible proof that the trade recommendations at the heart of Gryphon's subscription business were good by any reasonable measure. It never analyzed the trade recommendations or determined whether they were as good as the track record that Gryphon represented to its clients. It can only respond by pretending that the evidence is not there.

ALAN S. FUTERFAS

Hon. Jack B. Weinstein
August 10, 2011
Page 5

The government made the quality of the trade recommendations central to the charges in both the criminal and civil actions when it claimed that defendants had perpetrated a fraud by, *inter alia*, claiming a "fake track record" to prospective subscribers (*see* Indictment at 8, DE 1) (misrepresentations included "fraudulent statements about past trading success"); (DE 360 at 6, see id. at 12)("Gryphon's Fake Track Record"). The heart of Gryphon's business was selling subscriptions consisting principally of trade recommendations. The government has represented that these trade recommendations were not the product of careful research but simply a necessary part of a larger scheme. (*See* Indictment, DE 1)  Yet, it has readily admitted that it never looked at the trade recommendations or endeavored to analyze them. (March 18, 2011 T. 19)("[The defense] are light years ahead of the government, as far as reviewing the documents.")

The record we have provided through the DeNigris Report as well as Steamsend shows that subscribers received email trade recommendations for their subscription, and these recommendations were good. The government's feeble response does not diminish this proof. First, the government claims that the trade recommendations on Streamsend do not include "the multitude of recommendations conveyed by telephone." (DE 360 at 41)  The government would have this Court believe – without presenting any evidence whatsoever - that there existed a separate universe of trade recommendations to subscribers who reached Gryphon by telephone that was different from the trade recommendations that those very same subscribers received through Streamsend, and that the recommendations provided only by phone were consistently far worse than those analyzed in the DeNigris Report. There is no proof (or logic) to this improbable claim.

For subscribers to the subscription services, there is but one universe of trade recommendations. All recommendations that subscribers received were sent to them by email through Streamsend. Indeed, a review of Streamsend shows that even subscribers to the more expensive services received email trade recommendations by this means. The government presents no evidence that this latter category of subscribers received trade recommendations only by telephone or that oral recommendations were not also distributed to them by email. Given the fact that the government apparently did not even know that Streamsend existed, much less bother to analyze its data, there is no way the government can credibly make that assertion. What is uncontradicted is that thousands of trade recommendations were distributed through Streamsend, as documented in the DeNigris Report. Any recommendations made only by phone-assuming there are any - must be proportionately small and cannot possibly be "the major source of Gryphon's trade recommendations." (DE at 41)

Second, the DeNigris Report lays to rest the government's tired canard that subscribers were defrauded by the frequent lack of a "sell" recommendation. (DE at 41)  Even the unmatched buy recommendations for options usually provided subscribers with an opportunity to turn a profit. (*See* Exhibit C to the Sentencing Memorandum, DE 352)  The unmatched equities were uniformly profitable if subscribers had simply held on and had not sold. (Id.)  Other evidence – the emails and disclaimers -- made it perfectly clear that Gryphon only provided

## ALAN S. FUTERFAS

Hon. Jack B. Weinstein
August 10, 2011
Page 6

recommendations. Gryphon urged its subscribers to seek the advice of others, such as brokers, with whom they actually placed their trades. Gryphon also suggested a "stop loss" limit within every single recommendation, thus reinforcing the notion that subscribers could not rely on Gryphon to tell them consistently when to sell. Finally, to state the obvious, subscribers could not have been fooled to think that every buy would come with a sell recommendation when their own experience indicated this was not true. Any subscriber who claims to have been fooled again and again and again by waiting in vain for an order to sell -- despite his own experience with Gryphon's buy recommendations – has himself to blame and cannot possibly claim he was defrauded. More fundamentally, the government wishes to ignore the overall quality of the trade recommendations that Gryphon provided. As to that, the DeNigris Report speaks for itself. It consistently outperformed the market. (See DeNigris Report trade results highlighted in yellow, DE 356 at Exhibit C) No amount of "luck," a rising stock market, or stealing "recycled recommendations legitimate newsletters" can explain away the extraordinary results that this report shows. (See DE 360 at 42-43) Subscribers clearly received value even if they were induced to purchase the subscription through dubious means.

**The Court's Rulings**

The government's selective narrative culminating in Mr. Marsh's guilty plea (DE 360 at 38-41) inadequately conveys the Court's rulings. Rather, the context of all four court appearances, which we described in fuller detail, informed Mr. Marsh's understanding of the Court's intentions with respect to sentencing. (*See* DE   at 3-15) Among many other statements that influenced Mr. Marsh, the Court conveyed to the defense that its rulings narrowing the scope of the charged scheme and the amount of resulting "loss" made a plea disposition more propitious and eliminated the need for the Rule 16 discovery that was unavailable to the defense. "This is not a game we are playing. We are trying to dispose of litigations." (April 6, 2011 T. 19). The Court further indicated that it ultimately need not resolve the disputed loss calculation at sentencing because it intended to impose a non-guidelines sentence. "With respect to the issue of the guidelines, which are predicated on amounts, the court is not going to follow the guidelines." (Id. T. 16), "I'm not in favor of applying the guidelines, so the exact amounts are not significant." (Id. T. 25) The Court assured the defense repeatedly that by pleading guilty to fraudulently inducing subscribers to purchase the trial subscription, Mr. Marsh would not be blind-sided at sentencing by cherry-picked "victims" who claimed losses that were not shown to be causally connected to the offense of conviction where actual trading histories were not disclosed. *See supra*. These rulings had the intended result of persuading Mr. Marsh to plead guilty promptly and of sparing very significant judicial resources.

# ALAN S. FUTERFAS

Hon. Jack B. Weinstein
August 10, 2011
Page 7

### Restitution Cannot Lawfully be Imposed in this Case

The Court should find that no restitution can be imposed because the determination of restitution is too complex. The government's proffered analysis – "the sum total of all payments" made by 1,052 "victims" -- is woefully insufficient. (DE at 43-45) It does not come close to the proof of causation that this Court instructed would be necessary in this case:

> THE COURT: Can you tell me how you are going to determine, with respect to each investor, whether the investor followed the recommendation, whether the investor lost or gained on the investment, and what other information the investor had as a prior investor, as a person without any information, or as a person consulting others? Because in determining whether the loss was attributable to the fraud, causality will have to be considered, and are you prepared to in effect examine over five thousand cases, and literally really probably hundreds of thousands of trades, in making that determination?

(April 6, 2011 T. 33) Simply adding up the payments to Gryphon of individuals claiming to have suffered losses ignores the question of causality and the facts behind each such claim. *See, e.g., United States v. Gushlak*, 2011 WL 3159170 (E.D.N.Y. 2011)(finding government's third attempt to show loss causation inadequate). It does not address whether any of these "victims" profited from any of the trade recommendations, failed to follow trade recommendations that would have been profitable, relied on the advice of others, suffered losses attributable to the natural risks of market activity, or whether the claimants generally made risky investments in their investing and blamed their investing losses on others, among the numerous facts not known to the defense or this Court. Therefore, even if this evidence were available and before the Court, it would be too complicated to assess for purposes of imposing restitution. 18 U.S.C. § 366A(c )(3); *Butler*, 264 F.R.D. at 39 (no restitution to victims ordered because "the extent of any loss to the victims was impossible to determine").

All of the victim statements are deficient. We note that only a small handful of people (3 to 5) ever gave Mr. Marsh the authority to trade in their accounts. More than a handful of victims, however, claim to have lost money in accounts purportedly handled by Mr. Marsh. These individuals are not identified to us, not even by name, and not a single supporting document is provided. We therefore doubt the veracity of their claims. They may not have invested as they claim, or they may have purchased subscriptions for trade recommendations that they did not follow. There is no way to discern the circumstances of these individuals' purported losses let alone assess the proof of causality as the law requires.

## ALAN S. FUTERFAS

Hon. Jack B. Weinstein
August 10, 2011
Page 8

  For all of these reasons, and those discussed in our sentencing memorandum on the "loss" calculation, the government has failed to provide a sufficient factual basis for restitution.

  Thank you for your consideration in this matter.

Respectfully yours,

Alan S. Futerfas

Enc.

cc: All Counsel

# Exhibit A

## ➲ Manage Members

You are here: View Member Details

Add New Member »

Profile Information - [ Edit ] [ Print ]

Member Email: billrtaryn@gmail.com  
Member Password: _%D__'_%_$Z___#  
Member Since: June 4th, 2007  
Member Status: Active  
Last Login:

Name: William McKee  
DOB:  
Gender:  
Median Income:

Registered By:  
Registration Tracking Code: N/A  
Promo Emails Allowed?: Yes

Company:

Address: 1428 Stoney Drive  
City, State, Zip / Postal Code: Yuba City, CA 95993  
Country: United States  
Primary Phone: 5307134824  
Secondary Phone:  
Fax: 5308229299

Reminder Phrase Question:  
Reminder Phrase Answer:

Posted Article Comments: (0)  
Auto Comment Allowed: No

### Member Notes

```
wants to start Private play service 09/01/07

9/7/07 Paid $5,000 Private Plays
9/7/07 Paid $5,000 Private Plays
9/7/07 Paid $5,000 Private Plays

9/14/07 $999 special DOT 1 year (KM)
09/10/07 $89 1 yr of MOW phone CW

09/27/07 Genome KM 1 yr $999.00

12/12/07 Put Client back on advertising list..

02/26/08 Wolves of Wall St.LIFETIME 50K (BA) PIF charged cc5x ok/mm
```

[ Update Member Notes ]

### Active Transactions - [ New Order ]

### Inactive Transactions

### Free Reports

### Premium Media Drip Email Log (last 25)

### Log In's (last 15)



N M <contactgryphon@gmail.com>

# Re: Gryphon Receipt

1 message

**William McKee <billrtaryn@gmail.com>**　　　　　　　　　　　　　　**Wed, Sep 10, 2008 at 10:23 PM**
To: Gryphon Financial <contactgryphon@gmail.com>

Baldwin,

I just faxed in the signed receipt to renew Daily Options Trader (DOT) as the subscription expires on 9-14-08 and placed a copy in the mail for your records. Per my previous email to you on 9-8-08 if you could respond to my first two bullet points it would be greatly appreciated.

Bill McKee

---

On Mon, Sep 8, 2008 at 8:13 AM, William McKee <billrtaryn@gmail.com> wrote:
Baldwin,

Per our conversation last week could you please provide me with the following information so that I can renew my subscription to GENOME & DOT:

- Date that the one year subscription to GENOME expires, my receipt shows it that I faxed it to you on 11-09-07 so I am assuming that is the date that the service started.
- Copy of the receipt you have for the $100,000 *special situation* that was advertized on the website, the money was wired to Gryphon Financial June 2008 as I am unable to locate my copy. Per my conversation with Michael Warren he advised me these type of investments are typically 3 years long and Gryphon Financial is entitled to a 2% management fee + 20% profits when the investment is reimbursed to the client.
- My receipt shows that the one year subscription to Daily Option Trader (DOT) expires on 09-14-07.

Bill McKee

---

On Thu, Sep 4, 2008 at 12:34 PM, Gryphon Financial <contactgryphon@gmail.com> wrote:
Dear William McKee,

Welcome to The Genome And The Daily Options Trader Service. We would like to thank you for your recent subscription on 09/04/08. As per your authorization, we have charged your credit card $1998.00. Attached is a receipt that we need printed, signed and returned to Gryphon Financial to activate your service. Please know that once we receive your **signed receipt and this signed confirmation** to verify your email address your service will begin. You can return your receipt and confirmation via fax; scanning and emailing or by mail.

In addition, following is our contact information and your log on information to keep for your records. If you have any further questions or concerns please feel free to contact us at any time.

Please know that your service is as described per your conversation with your representative. If you need

more information please don't hesitate to call.

Phone #: 800.828.9921

Local #: 718.370.2883

Local #: 212.859.5088

Fax #: 718.370.2887

Website: www.gryphonfinancial.net
Email Address: contact@gryphonfinancial.net


Username: billtaryn
Password: 100kmonth

**\*\*PLEASE SEND SIGNED ATTACHED RECEIPT & SIGNED CONFIRMATION\*\***
**\*\*Two(2) Documents to be signed & returned\*\***


Thank You,
Gryphon Management

_____
Client Signature



N M <contactgryphon@gmail.com>

## Services
1 message

**William McKee <billrtaryn@gmail.com>**      Thu, Oct 9, 2008 at 4:48 PM
To: Baldwin Anderson <banderson@gryphonfinancial.net>, Gryphon Financial-GMail <contactgryphon@gmail.com>, William McKee <billrtaryn@gmail.com>

Baldwin,

Just called the office to speak to you and the answering machine picked up the message so thought I would send you a note vs. leave a long message on the phone.

Sorry to be slow getting back to you, its been a very rough few weeks for me since we last talked. Last week I had surgery on the right kidney to remove several cysts and also had extra corporeal shock wave therapy (ESWL) on the left kidney to break up the kidney stones, then made two trips to the ER for IV pain therapy to help pass the stones. I am looking forward to getting healthy again.

Here is a quick review of our last conversation:

1. Please check your file to determine the date my subscription to GENOME expires, the date I have on that I faxed the receipt to start services was on 11-09-07 and I want to make sure that I renew on time.

2. I cannot find the a copy of the signed receipt for the $100K unit investment trust I made about 6 months ago, the money was wired to Gryphon Financial. If you could forward/fax a copy to me it would be appreciated.

3. Michael trading our two separate accounts: My wife has been absolutely frantic over current status of the stock market and the only trade that Michael made was for a loss of approximately $4K so she wanted him to stop trading in the account. I know we discussed this and I completely understand there are losses yet she was 'hoping' to make money on the very first trade. With the current state of the stock market she is not at all willing to have any trading in her account. I know we discussed this in our last call and I realize that Michael does not understand this decision; I would rather have Michael mad at me than my wife. I am 'still' in the process of selling some real estate and when escrow closes will be able to transfer $150K-$160K into the other account for Michael to trade and will let you know as soon as that transaction is completed.

One more quick thing, I saw the ad on Google today for Wolves of Wall Street for $99 per week and I am wondering if that is the new evolved program I signed up for last year. On February 2, 2007 I forward to Gryphon $50K for a lifetime subscription to the Wolves of Wall Street and I wondering if that is the same service.

Look forward to speaking with you soon,
Bill McKee



N M <contactgryphon@gmail.com>

## Gryphon Services

2 messages

**Gryphon Financial <contactgryphon@gmail.com>**       Mon, Jun 15, 2009 at 12:11 PM
To: billrtaryn@gmail.com

Dear Dr. McKee:

    Just for your information, some or all of your services are due to expire soon.  Please call or e-mail to discuss further subscription options.
We appreciate your business.

Gryphon Management
800-828-9921

**William McKee <billrtaryn@gmail.com>**       Sun, Jun 21, 2009 at 3:28 PM
To: Gryphon Financial <contactgryphon@gmail.com>, Baldwin Anderson <banderson@gryphonfinancial.net>, Bill McKee <drbillm@comcast.net>

Gryphon Financial,

Thank you for the heads up. My records show that I faxed in the agreement for both the Daily Options Trader and Genome Service on 9-6-09 and they both expire on 9-12-09. I will be sending in a new agreement as the date becomes closer to their expiration date.


Bill McKee

[Quoted text hidden]

StreamSend

http://server1.streamsend.com/streamsend/?p=report&PHPSESSID=7...




Logged in: **kenneth marsh**   Quick Links

## Reports: Email Detail

**List Manager**
- Create New List
- Modify List

**Subscriber Manager**
- Manage Subscribers
- Add A Subscriber
- Demographic Reports

**List Tools & Utilities**
- Upload Your List
- Download Your List
- Configure Web Site Form

**Email Manager**
- Send Emails
- View Email Reports

**Custom Saved Emails**
- Create & Save Email
- Manage Saved Emails

**Advanced Tools**
- Manage Triggers

**Report detail for "'BUY OMTR'(#94402)"**
Status: sent
Date Sent: 2009-07-29 09:19:39
View Message:

### DELIVERY STATISTICS
Total emails sent: 197

Undelivered: 9 (5%)
Bounced back: 0 (<1%)
Sent Successfully: 188 (95%)

### VIEW STATISTICS
| | |
|---|---|
| # of Views | 188 |
| # of Unique Views | 95 |
| Unique View Percentage | 50.53% |

### UNSUBSCRIBE STATISTICS
| | |
|---|---|
| # of Unsubscribers: | 0 |
| Complaints: | 0 |

### SUBSCRIBER ACTIVITY
| | |
|---|---|
| Emails Forward | 0 |
| New Subscribers from emails forward | 0 |

### CLICK THROUGH ACTIVITY
No click history available for this message.

Back

StreamSend

http://server1.streamsend.com/streamsend/?p=viewuniqueviewers&...



Logged in: **kenneth marsh**   Quick Links

### List Viewers

**List Manager**
- Create New List
- Modify List

**Subscriber Manager**
- Manage Subscribers
- Add A Subscriber
- Demographic Reports

**List Tools & Utilities**
- Upload Your List
- Download Your List
- Configure Web Site Form

**Email Manager**
- Send Emails
- View Email Reports

**Custom Saved Emails**
- Create & Save Email
- Manage Saved Emails

**Advanced Tools**
- Manage Triggers

Browse subscribers who have viewed message# 94402

Page 1

| Email | Last View Time | Number of Views |
|---|---|---|
| 6970mu@gmail.com | 2009-07-30 13:50:07 | 1 |
| ALAMANDA@GMAIL.COM | 2009-08-02 07:12:04 | 4 |
| albot917@optonline.net | 2009-07-29 09:50:17 | 1 |
| alvinyappy@hotmail.com | 2009-07-29 09:24:11 | 1 |
| anthonyhusain@hotmail.com | 2009-07-29 09:51:04 | 1 |
| basilio.teixeira@gmail.com | 2009-10-02 09:57:06 | 1 |
| bcbertea@msn.com | 2009-07-30 06:26:04 | 1 |
| bellebirdman@earthlink.net | 2009-08-02 19:37:04 | 2 |
| billrtaryn@gmail.com | 2009-07-29 10:33:06 | 1 |
| birrenbach@gmail.com | 2009-07-31 13:41:03 | 2 |
| blacktop@netsync.net | 2009-07-29 14:02:07 | 1 |
| bobdarr1@yahoo.com | 2009-07-30 12:54:05 | 2 |
| bradjt99@yahoo.com | 2009-07-29 10:49:06 | 1 |
| brenneman70@gmail.com | 2009-07-29 09:57:03 | 1 |
| brentlibby@vcpsir.com | 2009-07-29 09:22:10 | 2 |
| caramac1@sympatico.ca | 2009-07-29 10:14:06 | 1 |
| chandra3737@yahoo.com | 2009-07-30 10:19:10 | 4 |
| chappybg@yahoo.com | 2009-07-29 11:10:10 | 1 |
| dannygloria@ezmailbox.net | 2009-07-29 11:10:10 | 1 |
| dborchowitz@gmail.com | 2009-07-29 19:31:06 | 3 |
| detertown@windstream.net | 2009-07-29 10:03:03 | 1 |